UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MOSES J. DURON,

               Plaintiff,

      v.

DR. GEORGE BEATTY, et al.,

               Defendants.

Case No. 15-cv-03015-YGR (PR)

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

This is a *pro se* civil rights action filed by Plaintiff Moses J. Duron, a state prisoner who is currently incarcerated at the California Substance Abuse and Treatment Facility ("CSATF"), pursuant to 42 U.S.C. § 1983.  The operative complaint is the amended complaint, in which he sought monetary damages and injunctive relief.  *See* Dkt. 19.  He alleged constitutional violations during his previous incarceration at San Quentin State Prison ("SQSP") from October 2013 through July 2015.  *Id.* at 3.[1]  Plaintiff specifically alleged a claim of deliberate indifference to serious medical needs against SQSP employees stemming from inadequate treatment for his left knee pain.  The alleged constitutional violations at SQSP ended on July 30, 2015, when Plaintiff was transferred from SQSP to Deuel Vocational Institution ("DVI").

The Court begins by outlining the procedural background of this matter.  On June 29, 2015, Plaintiff filed his original complaint.  Dkt. 1.  In an Order dated January 6, 2016, the Court determined that the original complaint raised a cognizable claim against the following Defendants: SQSP Physician George Beatty, M.D.; SQSP Registered Nurse ("RN") Bill Honey; and SQSP Chief Medical Officer Elena Tootell (hereinafter "the served Defendants").  *See* Dkt. 6. The following summary of Plaintiff's claim is taken from the Court's January 6, 2016 Order, which

---

[1] Page number citations refer to those assigned by the court's electronic case management filing system and not those assigned by the parties.

states as follows:

> Plaintiff's allegation that since February 5, 2015, he has suffered "great pain" to his left knee (which initially required an M.R.I. and for which a knee replacement is now recommended due to a "torn meniscus") supports an inference that he has serious medical needs. Dkts. 1 at 3, 6 at 1. Liberally construed, Plaintiff's allegations that SQSP prison medical staff failed to provide adequate medical treatment for his left knee pain—by specifically denying his requests: for an ice pack and a walking cane from Defendant Beatty; to be examined by Defendant Honey; and to speak with Defendant Tootell—state a cognizable deliberate indifference claim against Defendants Beatty, Honey and Tootell. Accordingly, this claim may proceed against these Defendants.

*Id.* at 2. The Court then directed the Clerk of the Court to serve the original complaint and issued a briefing schedule for the served Defendants to file a dispositive motion. *See id.* at 3-4.

On March 11, 2016, the served Defendants filed a motion to dismiss the original complaint under Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff had not exhausted his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Dkt. 13. Plaintiff opposed that motion and also requested leave to file a proposed supplemental claim. *See* Dkt. 14.

In an Order dated November 14, 2016, the Court granted Plaintiff leave to file an amended complaint, which could include "the claims found cognizable in his original complaint as well as the claim he seeks to add by way of his proposed supplemental claim mentioned in his opposition." Dkt. 18 at 6. The Court also denied the served Defendants' motion to dismiss without prejudice to renewing their arguments after Plaintiff had filed his amended complaint. *See id.*

On December 9, 2016, Plaintiff filed his amended complaint. Dkt. 19. Plaintiff named the same aforementioned served Defendants from the original complaint and an additional Defendant: SQSP Physician Allison Devers, M.D. *Id.* at 2. He also specified that the time period for the alleged Eighth Amendment violation was from October 2013 through July 2015. *Id.* at 3.

On March 30, 2017, all Defendants filed another motion to dismiss for failure to exhaust administrative remedies. Dkt. 20.

In an Order dated December 18, 2017, the Court denied the motion to dismiss upon finding

2

that it could not be discerned from the face of the amended complaint "whether or not Plaintiff still had administrative remedies available to him, and whether or not Plaintiff had a full opportunity and ability to file a timely grievance but did not do so." Dkt. 27 at 9. The Court then set a new briefing schedule upon concluding that this case "cannot be dismissed under Rule 12(b)(6) on exhaustion grounds," but that this argument may be renewed in a summary judgment motion. *Id.* at 10. The Court also reviewed the amended complaint and concluded as follows: (1) that Plaintiff's claims for injunctive relief were dismissed as moot given that he was no longer incarcerated at SQSP; and (2) that the new allegations in his amended complaint stated a claim of deliberate indifference to his serious medical needs against Defendants Beatty, Honey, Tootell, and Devers (hereinafter "Defendants"). *Id.* at 7-8.

On January 8, 2018, Defendants filed an answer to the amended complaint. Dkt. 28.

The parties are now presently before the Court on Defendants' motion for summary judgment. Dkt. 37. Defendants move for summary judgment on Plaintiff's claim of deliberate indifference to serious medical needs on the following grounds: (1) failure to exhaust administrative remedies; and (2) failure to provide evidence that Defendants' were deliberately indifferent to Plaintiff's medical needs. *Id.* at 16-22. Specifically, the argue that Plaintiff cannot show that Defendants Beatty's, Honey's, and Devers's treatment of Plaintiff's left knee pain amounted to: (1) deliberate indifference of his serious medical needs; or (2) a medically unacceptable course of treatment chosen in conscious disregard to Plaintiff's health. *Id.* Defendants also claim that "[Defendant] Tootell was not involved in [Plaintiff's] care" and that this Defendant "was not even involved with [Plaintiff] through the inmate appeals process." *Id.* Thus, Defendants argue that Plaintiff has not made a causal link between Defendant Tootell and the violation of his constitutional rights. *Id.* at 22-23.

Plaintiff has filed an opposition to Defendants' motion, and Defendants have filed a reply. Dkts. 44, 45.

Having read and considered the papers submitted in connection with this matter, the Court hereby GRANTS Defendants' motion for summary judgment.

3

## II.    FACTUAL BACKGROUND[2]

### A.    Relevant SQSP Policy Regarding Administrative Health Care Appeals

Effective August 1, 2008, health-care appeals involving inmate medical, dental, and mental health-care issues have been processed by the California Correctional Health Care Services.  Gates Decl. ¶ 3.  At SQSP, inmates prepare their own California Department of Corrections and Rehabilitation ("CDCR") 602 health care form when they want to file an appeal/grievance regarding medical staff or care.  Mamongay Decl. ¶ 4.  When an inmate submits a form, the form is routed to the Health Care Appeal/Grievance Office Coordinator for stamping to designate receipt.  *Id.*  It is then scanned and logged into the Health Care Appeals and Risk Tracking System ("HCARTS") and assigned a tracking number.  Gates Decl. ¶ 4.  The HCARTS tracks inmate health care appeals that are processed by the institution at the first and second level of review, as well as those processed by the Health Care Correspondence and Appeals Branch ("HCCAB") and adjudicated at the third level of review.  *Id.*  The HCARTS also tracks health care appeals that were received and ultimately rejected.  *Id.*  It is maintained as a regular course of business, and the computer entries are made at or near the time of the occurrence by the employee who processes the health care appeal.  *Id.*

The HCCAB is part of the CDCR responsible for providing oversight to administrative health care appeals relating to medical, dental, and mental health care services to adult inmates within California institutions.  Gates Decl. ¶ 1.  The HCCAB receives, reviews, and maintains all health care appeals accepted for the third level, which is the final level of review in the inmate

---

[2] This Order contains many acronyms.  Here, in one place, they are:

| | |
|---|---|
| CDCR | California Department of Corrections and Rehabilitation |
| CSATF | California Substance Abuse and Treatment Facility |
| DVI | Deuel Vocational Institution |
| HCARTS | Health Care Appeals and Risk Tracking System |
| HCCAB | Health Care Correspondence and Appeals Branch |
| HCSR | Health Care Services Request |
| MRI | Magnetic Resonance Imaging |
| NSAID | Nonsteroidal Anti-Inflammatory Drug |
| RN | Registered Nurse |
| SQSP | San Quentin State Prison |

health care appeal process, and renders decisions on these health care appeals. *Id*. at ¶ 3.

Once the form is scanned and logged into the HCARTS, a clinician triages the appeal/grievance for its degree of urgency. Mamongay Decl. ¶ 4. Afterwards, the form is routed back to the Health Care Appeal/Grievance Coordinator for screening before being routed to appropriate staff for an interview, assessment, and response. *Id*. The appeal/grievance and response are reviewed by a supervisor and scanned into the HCARTS before being given to the inmate. *Id*. Thus, CDCR 602 health care forms submitted by inmates at SQSP are recorded and maintained at or near the time of its submission in the HCARTS. *Id*. at ¶ 5.

### B. Plaintiff's Health Care Appeals/Grievances at SQSP

The following background related to Plaintiff's health care appeals/grievances at SQSP is taken from the Court's December 18, 2017 Order resolving Defendants' previously-filed motion to dismiss for failure to exhaust, which states as follows:

> Plaintiff alleges he submitted the facts in his amended complaint through the grievance procedure when he submitted 602 Inmate Appeal log no. SQ160293 ("SQ160293"), which was dated January 1, 2016, and filed with the CDCR on February 11, 2016. Dkt. 19 at 1-2. On his amended complaint, Plaintiff checked both boxes for "YES" and "NO" in response to the question: "Is the last level to which you appealed the highest level of appeal available to you?" *Id*. at 2. Plaintiff elaborates by stating that SQ160293 was "sent from [CSATF] and cancelled." *Id*. at 1. He further states the following relating to SQ160293: "Cancelled appeal on 2/26/16 by [SQSP] Appeals Office [and] cannot be resubmitted therefore deeming appeal process exhausted." *Id*. Thus, Plaintiff alleges he both did *and* did not fully exhaust his appeal to the *highest level* of appeal available, and claims the CDCR "ha[s] a pattern that is a practice which unduly violates appellant's due process by way of circumventing [the] issue, cancelling or rejecting appeals." *Id*. at 2.
>
> Attached to Plaintiff's amended complaint is a copy of SQ160293, which he has labeled as Exhibit 1. *See id.*, Ex. 1. SQ160293 relates to the June 18, 2015 incident during which Plaintiff claims he fell down stairs, injured himself, and did not receive any treatment for his injuries. *See id*. Under the section labeled, "Action requested," Plaintiff states he requests that "CDCR medical staff be accountible [sic] for thier [sic] negative actions and unprofessional attitude to [his] medical needs." *Id*. On February 26, 2016, SQ160293 was canceled at the first level of review. *Id*. In support of SQ160293, Plaintiff had attached copy of another 602 inmate appeal log no. SQ-L-15-3230 ("SQ-L-15-3230"), in which Plaintiff complains that he had submitted a previous 602 appeal on June 21, 2015 that was "based on [him] falling at SQ[SP]" and that he had not yet received a response." *Id.*, Ex. 1. SQ-L-15-3230 was rejected at the first level

of review on three different dates: November 23, 2015, December 1, 2015, and January 13, 2016. *Id.* In the January 13, 2016 rejection of SQ-L-15-3230, the appeals coordinator noted that: "[a] review of our records does not show that you submitted an appeal around June of 2015. Provide a copy of your appeal." *Id.* In response to this rejection letter, Plaintiff wrote as follows: "I filled out a new 602 in place of [the] original 602 that has been misplaced by [SQSP] staff there after 6/21/15." *Id.* Nothing in the record exists to show that Plaintiff pursued either SQ160293 or SQ-L-15-3230 to the highest level of review. *Id.* Similarly, no copy of the 602 appeal dated June 21, 2015 exists on the record. *Id.*

Dkt. 27 at 8-9 (footnote omitted).

### C.    Background Relating to Plaintiff's Left Knee/Leg Injury

Plaintiff's medical records show that he had a longstanding malformation of his lower left leg due to a motor vehicle accident in 2002 and the resulting multiple surgeries which, according to him, "[h]ealed wrong [because] [he] tried to escape from [an] outside hospital (Enlo[e] Hosp. in Chico) window while in jail." Beatty Decl. ¶ 10; Dkt. 40 at 23.

### D.    Plaintiff's Medical Care and Treatment for His Left Knee Pain at SQSP

On October 8, 2013, Plaintiff submitted a Health Care Services Request ("HCSR") form complaining that his left knee was swelling and requesting "new shoes" and to "see RN or doctor ASAP." Dkt. 19 at 21. On October 10, 2013, RN E. Monroe and RN A. Bird reviewed the HCSR and emailed the doctor that Plaintiff wanted to ask for an "ice chrono[3]" and replacement shoes. *Id.*

On October 18, 2013, Plaintiff submitted another HCSR form requesting "more Terazosin[4] 5 mg. caps[ules] . . . medical shoes . . . [and] surgery on [his] left knee [because] it[']s swelling up and hurts." *Id.* at 22. On October 21, 2013, RN Monroe sent a copy of the HCSR form to the pharmacy and noted that Plaintiff, who was 5'8'' and weighed 230 lbs., had complaints of "musculoskeletal" issues. *Id.*

Beginning on February 26, 2014, Defendant Beatty, who has been a Physician and Surgeon at SQSP since early 2014, was assigned to Plaintiff as his Primary Care Provider. *Id.* at ¶ 5. On that date, Defendant Beatty met with Plaintiff to discuss his left knee pain. *Id.* at ¶ 10.

---

[3] A "chrono" is a form that allows prisoners to request certain medical accommodations as deemed necessary by medical staff. Beatty Decl. ¶ 10.

[4] Terazosin is used alone or with other drugs to treat high blood pressure (hypertension). *See* https://www.webmd.com/drugs/2/drug-6834/terazosin-oral/details (last visited Aug. 23, 2018).

1  Plaintiff requested two chronos—one for new shoes and another for ice for his left knee.  *Id.*

2  According to Defendant Beatty, Plaintiff "wore a brace, and showed progressive degeneration and

3  pain in both knees and left ankle."  *Id.*  Defendant Beatty "observed no swelling or effusion in his

4  left knee."  *Id.*  Defendant Beatty and Plaintiff "discussed the management of [Plaintiff's] pain,"

5  and Plaintiff "was agreeable to converting his current morphine dose to methadone to alleviate his

6  pain."  *Id.*; Dkt. 40 at 51.

7       On March 28, 2014, Defendant Beatty again met with Plaintiff in response to his HCSR

8  form that indicated he was still experiencing knee pain.  Beatty Decl. ¶ 11.  Defendant Beatty

9  "attempted to reconcile [Plaintiff's] pain medications by giving him a new prescription for 10

10  milligrams of methadone for 90 days."  *Id.*; Dkt. 40 at 67.

11       On April 1, 2014, after complaining of left leg pain related to his work that consisted of

12  lifting and working long hours on his feet, Plaintiff was granted a "lay-in," which is the term used

13  for when an inmate needs to be excused from their work assignment.  Beatty Decl. ¶ 12; Dkt. 40 at

14  52-54.  In this instance, the lay-in allowed Plaintiff to be excused from work for fifteen days until

15  he saw his Primary Care Provider.  *Id.*

16       On April 16, 2014, Defendant Beatty met with Plaintiff for a routine follow up to address

17  his ongoing pain management issues.  Beatty Decl. ¶ 13.  Defendant Beatty decided to increase

18  Plaintiff's evening methadone dose to fifteen milligrams.  *Id.*  Defendant Beatty declined to restart

19  morphine as both he and Plaintiff had agreed to an equivalent dose of methadone in lieu of

20  morphine.  *Id.*  Defendant Beatty explained that Plaintiff had likely developed some tolerance to

21  morphine that could decrease its therapeutic effect.  *Id.*  Defendant Beatty re-referred Plaintiff to

22  the orthotics clinic for potential adjustment to his leg brace and for evaluation of orthotics or

23  inserts in his boots.  *Id.*  In addition, Defendant Beatty rewrote a directive to state that Plaintiff had

24  a limitation for standing at work for one hour at a time.  *Id.*; Dkt. 40 at 12, 55-56, 68.

25       On July 1, 2014, Defendant Beatty again examined Plaintiff, who primarily complained of

26  back pain that day.  Beatty Decl. ¶ 14.  As Defendant Beatty noted, Plaintiff had a "leg length

27  discrepancy."  *Id.*  Defendant Beatty also noted that the anticipated scheduling for prosthetics

28  fitting might alleviate Plaintiff's back pain, which radiated into his legs.  *Id.*; Dkt. 40 at 57-58.

On September 10, 2014, Plaintiff informed Defendant Beatty that he was in the process of "pursuing legal avenues of resolution" because he still "ha[d] not gotten orthotics/orthopedic boots replaced." Beatty Decl. ¶ 15. Defendant Beatty explained that he attributed the failure to a "scheduling issue." *Id*. Defendant Beatty e-mailed the scheduler to expedite the process. *Id.* Plaintiff and Defendant Beatty then discussed the possibility that Plaintiff might require further orthopedic surgery to address some of his issues. *Id*. Plaintiff mentioned his preference to have surgery outside SQSP. *Id*. Defendant Beatty concurred as Plaintiff was scheduled to go before the Board of Parole Hearings for possible resentencing. *Id*.; Dkt. 40 at 13-14, 59-60.

On October 29, 2014, Plaintiff received his orthopedic shoes and orthotics. Beatty Decl. ¶ 16; Dkt. 40 at 61.

On November 7, 2014, Plaintiff requested a renewal of his low bunk chrono and wanted to reconsider the possibility of corrective surgery now that his appeal for resentencing seemed unlikely. Beatty Decl. ¶ 17. Plaintiff weighed 233 pounds, an increase from the 225 pounds he weighed two months earlier. *Id*. Defendant Beatty found "no effusion or swelling, minimal tenderness at the joint line of his left knee, but crepitus[5] with extension." *Id*. (footnote added). Plaintiff's ligaments were stable. *Id*. Defendant Beatty referred Plaintiff for an orthopedic evaluation and renewed his low bunk chrono. *Id*.; Dkt. 40 at 62-63.

On December 11, 2014, Plaintiff was seen by Dr. William C. Lyon[6] in the on-site orthopedics clinic. Beatty Decl. ¶ 18 (footnote added). Dr. Lyon requested x-rays and a return visit. *Id*. Dr. Lyon also advised Plaintiff to abide by certain work restrictions and granted him another lay-in. *Id*.; Dkt. 40 at 64.

On December 16, 2014, Plaintiff submitted an HCSR form related to the pain in his left knee and right ankle. Beatty Decl. ¶ 19. A day later, Defendant Honey, an RN, called the

---

[5] Crepitus is the "grinding, grating feeling or a crunchy sound when joints move." *See* https://www.webmd.com/osteoarthritis/qa/what-are-the-symptoms-of-osteoarthritis (last visited Aug. 17, 2018).

[6] Defendant Beatty spells Dr. Lyon's last name incorrectly as "Lyons." *Compare* Beatty Decl. ¶ 18 *with* Dkt. 40 at 64, 66.

1    radiology and specialty departments about having Plaintiff's x-rays taken prior to his December

2    22, 2014 follow-up visit.  Beatty Decl. ¶¶ 19, 22; Dkt. 40 at 64-65.

3          On December 22, 2014, Dr. Lyon re-ordered the x-rays.  Beatty Decl. ¶¶ 20, 22[7]; Dkt. 40

4    at 66.  That same day, Dr. D. Goller, the radiologist, provided his report of the x-rays for Plaintiff.

5    Beatty Decl. ¶ 20.  Relative to Plaintiff's left knee, the report noted "[m]oderate degenerative

6    changes on the left knee."  *Id.*; Dkt. 40 at 15.

7          On January 7, 2015, Plaintiff had another appointment with Defendant Beatty.  Beatty

8    Decl. ¶ 22.  Because the x-rays were not initially available for his follow-up visit with Dr. Lyon on

9    December 22, 2014, Plaintiff was instead "scheduled for a follow-up with orthopedic surgery to

10   review the x-rays and discuss future recommendations."  *Id.*  In the interim, Defendant Beatty

11   reclassified Plaintiff in order that his prison job would not entail standing or involve any use of

12   heavy machinery.  *Id.*  Plaintiff agreed, and Dr. Lyon concurred.  *Id.*  Defendant Beatty continued

13   Plaintiff's non-steroidal and methadone pain management until his next orthopedic visit

14   approximately four to six weeks later.  *Id.*; Dkt. 40 at 16.

15         On January 8, 2015, Plaintiff met with Dr. Lyon to discuss Plaintiff's left knee.  Beatty

16   Decl. ¶ 23.  Dr. Lyon was not convinced Plaintiff would need a total knee arthroplasty.[8]  *Id.*  Dr.

17   Lyon believed that even though Plaintiff had failed physical therapy and intra-articular steroids in

18   the past at a prior institution, he thought it was worth another trial of physical therapy along with a

19   knee sleeve.  *Id.*  Dr. Lyon also believed Plaintiff "had enough disease at this point to warrant an

20   [magnetic resonance imaging ("MRI")] to better evaluate his degenerative disease and rule out any

21   concomitant connective tissue chronic injury."  *Id.*; Dkt. 40 at 17-19, 21.

22         On January 21, 2015, Plaintiff had another appointment with Defendant Beatty for a

23   mandatory follow-up visit concerning Plaintiff's orthopedic surgery evaluation for his left knee.

24   Beatty Decl. ¶ 23.  Due to Dr. Lyon's recommendations, Defendant Beatty planned to submit a

25

26         [7] The Court notes that Defendant Beatty's declaration is missing paragraph 21.  *See* Beatty
Decl. at 5.

27

28         [8] Arthroplasty is another word for knee replacement surgery.  *See*
https://www.webmd.com/osteoarthritis/guide/knee-replacement-surgery#1 (last visited Aug. 17,
2018).

request for an MRI of Plaintiff's left knee. *Id.* Defendant Beatty also "supported the repeat trial of physical therapy, as well as the need to give [Plaintiff] a chrono for a soft knee sleeve." *Id.* The plan was to follow up with orthopedic surgery after the MRI. *Id.*; Dkt. 40 at 17-19, 21.

On February 5, 2015, Plaintiff went in for an MRI on his left knee. Dkt. 1 at 3; Beatty Decl. ¶ 24; Dkt. 40 at 20.

On February 18, 2015, Plaintiff submitted an HCSR form to talk to a doctor about his left knee pain. Beatty Decl. ¶ 25; Dkt. 40 at 22. Plaintiff claimed that he had not received "his leg brace yet or therapy," and he wanted surgery. *Id.* Defendant Honey informed Plaintiff that he had a scheduled follow-up visit with Defendant Beatty on March 3, 2015, and another scheduled visit with an orthopedic specialist. *Id.* Defendant Honey also "sent the medical supply [department] a copy of the chrono . . . to get the sleeve delivered to [Plaintiff]." *Id.*

On March 3, 2015, Defendant Beatty was unavailable for the appointment with Plaintiff. Beatty Decl. ¶ 26. Instead, Plaintiff met with Dr. J. Lee concerning his left knee pain. *Id.*; Dkt. 40 at 24. Dr. Lee reiterated the plan for physical therapy and use of the leg sleeve. *Id.*

On March 17, 2015, Plaintiff submitted an HCSR form indicating that he had needed to "see a doctor ASAP" because the extreme pain in his back caused his severe sleep deprivation. Beatty Decl. ¶ 27; Dkt. 40 at 24-25. On March 18, 2015, Defendant Honey made an urgent referral to Defendant Beatty after seeing Plaintiff. *Id.*

On March 19, 2015, Defendant Beatty examined Plaintiff, diagnosed him "Lumbar musculoskeletal strain," and noted the following:

> The patient does have a chronic pain syndrome, but this seems to be clearly superimposed soft tissue injury. I do not see any alarming signs or symptoms at this time, and the patient feels he is managing fairly well. He does state that he has been asked to work in an unlimited fashion, though he already has standing restricted work designation with restriction[s] on lifting and standing. I will renew this with a new [CDCR] 128 C3 [Chrono][,] and I will submit his chronos into the system, which will designate him low bunk and ground floor, based on his malformation and need for [a] knee brace. In the meantime, he will continue with modification of activities and rest as needed. He will add some Naprosyn[9] to see if this helps, and

---

[9] Naproxen (brand names: Aleve, Naprosyn, and many others) is an NSAID, which works by blocking the body's production of certain natural substances that cause inflammation and

> I will give him a short course of baclofen.[10]  He will continue with the same dose of methadone.  He will return for any worsening or new symptoms, particularly lower extremity pain, weakness or numbness, and he will let me know if he is not improved by the end of the month.  Otherwise, he appears to be quite stable, and we will follow him up at his regularly scheduled Chronic Care follow-up visit for the remainder of his medical problems.

Beatty Decl. ¶ 28; Dkt. 40 at 26 (footnotes added).

On April 10, 2015, Defendant Beatty requested physical therapy to help relieve Plaintiff's chronic pain, which was approved four days later on April 14, 2015.  Beatty Decl. ¶ 29; Dkt. 40 at 27, 44.

Also, in April 2015, Plaintiff began requesting a transfer to another institution that did not have stairs.  Beatty Decl. ¶ 30; Dkt. 40 at 28.

On May 11, 2015, Defendant Honey met with Plaintiff based on his complaints of left leg and back pain, and referred him to Defendant Beatty.  Beatty Decl. ¶ 31; Dkt. 40 at 29-31.

On May 25, 2015, Plaintiff met with Defendant Beatty in order to discuss his left knee and lower back pain.  Beatty Decl. ¶ 31.  Defendant Beatty wrote his diagnosis of "degenerative disease" as the cause of Plaintiff's left knee and lower back symptoms.  *Id*.  Defendant Beatty suggested that Plaintiff request another orthopedic surgery evaluation, but Plaintiff indicated that he wanted to wait until he transferred to California Medical Facility for an orthopedic surgery evaluation there instead.  *Id*.  Plaintiff expressed that he was "quite frustrated [on that day] due to the inability of getting a follow-up [visit] scheduled]" and stated that "nothing [was] being done for [his] pain" and that "he [was] planning litigation because of this."  *Id.*; Dkt. 32.  Defendant Beatty acknowledged that Plaintiff's physical therapy evaluation and orthopedic follow-up appointment appeared to have been delayed due to scheduling backlogs of these providers.  *Id.*; Dkt. 40 at 32-33.  Defendant Beatty ordered Plaintiff an extended lay-in to June 15, 2015, and increased his pain medication, methadone, by five milligrams.  *Id*.  Defendant Beatty indicated

---

relieving pain from various conditions.  *See* https://www.webmd.com/drugs/2/drug-1705-2289/naprosyn-oral/naproxen-suspension-oral/details (last visited Aug. 17, 2018).

[10] Baclofen (Gablofen, Lioresal) is a medication that treats spasticity, a condition marked by stiff muscles and spasms.  *See* https://www.webmd.com/multiple-sclerosis/qa/what-is-baclofen (last visited Aug. 17, 2018).

that "[Plaintiff] was satisfied with these measures and felt his needs [had] been addressed to the extent possible [on that day]." *Id.*, Dkt. 40 at 33.

### E. Plaintiff's June 18, 2015 Fall at SQSP and Resulting Medical Care and Treatment

On June 18, 2015, Plaintiff reported that he was going "down stairs to the lower yard," and "missed a step a[nd] fell and hurt [him]self again." Beatty Decl. ¶ 32; Dkt. 40 at 34.

On June 19, 2015, Plaintiff was treated in the Triage & Treatment Area for left knee pain from a knee-injury." Beatty Decl. ¶ 32. Plaintiff stated that "[he] fell on the stairs . . . and hit [his] leg." *Id.* Plaintiff then underwent a comprehensive musculoskeletal examination by RN Corpuz, who noted that Plaintiff was found to be stable and ambulatory. *Id.* Plaintiff was given an order for ice and a cane. *Id.* Plaintiff was referred to Defendant Devers, an SQSP physician. *Id.*; Dkt. 40 at 35-37. On that same day, Defendant Devers performed a comprehensive examination regarding Plaintiff's musculoskeletal complaints. *Id.* at ¶ 33. She found "his left knee [was] tender at both the medial and lateral joint lines, no change in laxity,[11] negative anterior drawer (test for [anterior cruciate ligament or "ACL"] damage), no effusion[12], and no focal swelling at the patella or posteriorly." *Id.* (footnotes added). Defendant Devers noted that Plaintiff had pain with varus (inward rotation)[13] and valgus (outward rotation)[14] stress at the medial knee, and diffused swelling. *Id.* Defendant Devers also examined Plaintiff's back and found it normal, except he was tender in the paraspinal lumbar muscles on the left. *Id.*; Dkt. 40 at 38-41. Defendant Devers noted that Plaintiff had chronic left knee pain and chronic low back pain, with an acute flare-up

---

[11] The Merriam-Webster Dictionary states the medical definition of "laxity" as "the quality or state of being loose." *See* Merriam-Webster Online Dictionary, retrieved August 20, 2018, from https://www.merriam-webster.com/dictionary/laxity.

[12] Effusion or "swollen knee" occurs when excess fluid accumulates in or around your knee joint. *See* https://www.mayoclinic.org/diseases-conditions/swollen-knee/symptoms-causes/syc-20378129 (last visited Aug. 20, 2018).

[13] Varus means "of, relating to, or being a deformity in which an anatomical part is turned inward toward the midline of the body to an abnormal degree." *See* Merriam-Webster Online Dictionary, retrieved August 23, 2018, from https://www.merriam-webster.com/dictionary/varus.

[14] Valgus means "of, relating to, or being a deformity in which an anatomical part is turned outward away from the midline of the body to an abnormal degree." *See* Merriam-Webster Online Dictionary, retrieved August 23, 2018, from https://www.merriam-webster.com/dictionary/valgus.

following his fall on June 18, 2015. Beatty Decl. ¶ 33. Defendant Devers prescribed ice for five days, a temporary cane, and noted Plaintiff had a Disability Not Impacting Placement Mobility form already completed. *Id*. Defendant Devers also prescribed "a muscle relaxant for seven days, continued narcotic pain medications, and ordered a lay-in ([including] meals delivered to his cell; medical showers) for 10 days." *Id*. She noted Plaintiff's allergy to ibuprofen meant that she could not give him an NSAID. *Id*. Instead, Defendant Devers wrote Plaintiff a prescription to include 1000 milligrams of methocarbamol (Robaxin[15]) twice a day for seven days. *Id*.; Dkt. 40 at 38-41.

On June 24, 2015, Plaintiff had a mandatory follow-up appointment with Defendant Beatty after being treated at the Triage & Treatment Area for his fall on June 18, 2015. Beatty Decl. ¶ 34. Defendant Beatty noted all the key details of Plaintiff's fall and resulting treatment. *Id*. Plaintiff stated that his pain had improved, his swelling was reduced, and he did not have any clicking or buckling of the knee. *Id*. Plaintiff did not request any additional accommodations or pain medications. *Id*. In the physical examination, Defendant Beatty found Plaintiff's "[l]eft lower extremity varus malformation as previously described," and the left knee had "some trace effusion and generalized edema surrounding the knee relative to the left." *Id*.; Dkt. 40 at 42. Defendant Beatty found "no joint line tenderness medially or laterally; and, noted some mild tenderness on compression of the medial compartment." *Id*. He found "no pain or laxity on medial collateral ligament and negative anterior drawer (test for ACL injury)." *Id*.; Dkt. 40 at 42-43. Defendant Beatty noted that the knee was healing as expected and that Plaintiff was managing well with his cane. *Id*. at ¶ 35. Defendant Beatty prescribed continued application of ice, a soft knee brace, and use of the cane until the knee was back to baseline. *Id*. In addition, Defendant Beatty prescribed Plaintiff to continue opiates for chronic pain. *Id*. Defendant Beatty also noted that Plaintiff was in the process of being transferred to another prison in order to minimize the use of stairs. *Id*.; Dkt. 40 at 42-43.

On July 6, 2015, the SQSP physical therapist noted that Plaintiff still had pain and

---

[15] Robaxin (generic name is methocarbamol) is used to treat muscle spasms/pain. *See* https://www.webmd.com/drugs/2/drug-11197/robaxin-oral/details (last visited Aug. 20, 2018).

recommended heat and/or cold treatment with three additional physical therapy visits. Beatty Decl. ¶ 36; Dkt. 40 at 45.

On July 13, 2015, Plaintiff requested that his lay-in be extended. Beatty Decl. ¶ 37. His lay-in request for meals and medical showers was granted for another sixteen days by RN Monroe. *Id.*; Dkt. 40 at 46.

**F.      Plaintiff's Medical Care and Treatment After His Transfer From SQSP**

On July 30, 2015, Plaintiff was transferred to DVI in Tracy. Beatty Decl. ¶ 38; Dkt. 40 at 47. Thereafter, on an unknown date, he was transferred to CSATF. Beatty Decl. ¶ 39. On November 6, 2015, Plaintiff was examined by CSATF RN Arietta for ongoing pain in his left knee. *Id.*; Dkt. 40 at 50. Plaintiff explained to RN Arietta that he previously had knee surgery in 2009 and that the pain was ongoing, and walking made it worse. Beatty Decl. ¶ 39. RN Arietta noted that Plaintiff was 5'8" and weighed 258 lbs., and that there was no swelling and limited range of motion. *Id.* RN Arietta did not refer Plaintiff to a doctor. *Id.* She noted that Plaintiff was currently on five milligrams of methadone. *Id.* She recommended heat and ice be applied as appropriate and told Plaintiff to submit an HCSR form if he had an increase in pain or swelling. *Id.*; Dkt. 40 at 48-49. No other further medical documents exist in the record to explain Plaintiff's medical care and treatment after November 6, 2015.

Finally, the Court notes that Plaintiff mentions in his opposition that he has since had knee surgery on an unknown date. Dkt. 44 at 5.

**III.      LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

14

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). In support of the motion for summary judgment, Defendant Beatty has presented his own declaration/supporting exhibits and Defendants have also attached declarations/supporting exhibits by HCCAB Chief S. Gates and SQSP Health Care Appeal/Grievance Office Coordinator Jessica Mamongay. Dkts. 38-40. Meanwhile, Plaintiff has filed his verified amended complaint and opposition. Dkts. 19, 44. The Court construes his amended complaint as an affidavit under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

## IV.   DISCUSSION

### A.   Deliberate Indifference to Medical Needs Claim

The Eighth Amendment protects prisoners from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under section 1983. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).

In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs." *Estelle*, 429 U.S. at 104. "This includes 'both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation omitted).

To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. A "serious medical need[]" exists if the failure to treat a prisoner's condition could result in further significant injury or the "[u]nnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing *Estelle*, 429 U.S. at 104), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. *McGuckin*, 974 F.2d at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

To satisfy the subjective element, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A plaintiff must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they

embarked on this course in "conscious disregard of an excessive risk to [the plaintiff's] health." *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*

Here, Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they denied him adequate treatment for his left knee pain from October 2013 through July 2015. Dkt. 19 at 3. Specifically, Plaintiff claims that Defendants "became aware of [his] complain[ts] of pain and were reluctant to take appropriate measures to not violate [his] right not to suffer needlessly." *Id.*

While Defendants seem to concede that, as alleged, Plaintiff's health condition may rise to the level of a serious medical need, they argue that no evidence exists to show that Defendants acted with "deliberate indifference" to that need. Dkt. 37 at 20-22. Defendants also argue that Defendants Beatty's, Devers's, and Honey's treatment of Plaintiff's left knee pain was within the standard of medical care and thus they did not deny Plaintiff any appropriate or reasonable medical treatment. *Id.* at 21-22. Specifically, Defendants argue that "[t]here is no direct evidence that [Defendant] Beatty suspected that [Plaintiff] had a serious risk of harm relating to his knee, which [Defendant] Beatty then ignored. *Id.* Following a review of Plaintiff's medical records, Defendants point out that Defendant Beatty

> avers that ". . . based upon my review of Mr. Duron's records, he received from Nurse Honey, Dr. Devers, and me, all reasonable and necessary care for his left knee complaints consistent with community standards and his medical condition. Their individual recommendations, as well as mine, were all medically acceptable ones. It is evident that Mr. Duron had problems with his left knee, but those problems were repeatedly addressed, assessed, and treated."

*Id.* at 22 (citing Beatty Decl. ¶ 42). Defendants further argue that "there is no circumstantial evidence that [Defendant] Beatty or [Defendant] Devers or [Defendant] Honey were aware of some risk, but consciously disregarded it." *Id.* at 22. Defendants further point out that "[t]he record is replete with evidence of [Defendants Beatty, Devers, and Honey] showing concern—not

indference—to [Plaintiff]." *Id.* Defendants claim that none of these Defendants denied Plaintiff any appropriate or reasonable medical treatment. *Id.* Finally, as mentioned above, Defendants argue that Defendant Tootell was "not alleged to have provided any treatment, nor do any medical records show that she was involved in Plaintiff's treatment." *Id.*

As mentioned above, a prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to act on the part of the defendant and a resulting harm. *McGuckin*, 974 F.2d at 1060. Such indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provided medical care. *See id.* at 1062.

To the extent that Plaintiff's claim amounts to medical malpractice or an allegation that Defendants were negligent in providing treatment, his allegations do not support an Eighth Amendment claim. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi*, 391 F.3d at 1060; *McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain).

Despite Plaintiff's claims that he received no treatment for his left knee pain, Defendants have submitted a verified declaration from Defendant Beatty indicating that Plaintiff's conditions and complaints were treated continuously based upon the medical evidence as well as the judgment of the medical providers. *See* Beatty Decl. ¶¶ 10-39. As explained in detail above, the evidence shows that during the time period at issue, each time Plaintiff presented with any left knee/leg pain or back pain, he was evaluated, treated with pain medication, and at some point, x-rays and MRIs were ordered as needed. Plaintiff was also referred for an orthopedic surgery evaluation for his left knee. However, Dr. Lyon explained that he was not convinced Plaintiff

18

would need a total knee replacement surgery. Instead, Dr. Lyon noted that Plaintiff would benefit from physical therapy along with a knee sleeve. Defendant Beatty examined Plaintiff based on extreme back pain in March 2015, diagnosed him "Lumbar musculoskeletal strain," and noted that Plaintiff was managing fairly well with the pain medication along with modification of activities and rest as needed. On May 11, 2015, Defendant Honey examined Plaintiff for his left knee/leg pain and referred him to Defendant Beatty. On May 25, 2015, Defendant Beatty noted his diagnosis of "degenerative disease" as the cause of Plaintiff's left knee and lower back symptoms. When Plaintiff complained of a delay in his treatment, Defendant Beatty acknowledged that Plaintiff's physical therapy evaluation and orthopedic follow-up appointment appeared to have been delayed due to scheduling backlogs of these providers. Due to this, Defendant Beatty increased Plaintiff's pain medication. After Plaintiff's June 18, 2015 fall, the record shows that Plaintiff was immediately seen the next day and treated in the Triage & Treatment Area for his knee injury. Meanwhile, Plaintiff provides a conclusory, unsupported statement in his opposition that staff "refused for a period of weeks to even give [him] crutches, a cane or ice" after his fall. *See* Dkt. 44 at 5. In contrast, as explained above, medical records show that Plaintiff was given a cane and referred to Defendant Devers, who examined him *the day after his fall*. Defendant Devers prescribed muscle relaxant, continued narcotic pain medication, and ordered a lay-in for ten days. Five days later, on June 24, 2015, Plaintiff was examined by Defendant Beatty, who noted that Plaintiff stated that the pain had improved, and his knee was healing as expected. Defendant Beatty prescribed continued application of ice, a soft knee brace and the use of the cane until the knee was back to baseline. Thereafter, on June 30, 2015, Plaintiff was transferred to DVI. In sum, the undisputed evidence (supported by Defendant Beatty's declaration and supporting exhibits) shows no evidence to suggest that any of Plaintiff's requests for medical treatment were ignored and could have resulted in further injury.

Furthermore, in his opposition, Plaintiff seems to claim that Defendants were deliberately indifferent for refusing to "provid[e] him the surgery that was necessary to cure the pain" in his left knee. Dkt. 44 at 2. As mentioned above, on June 29, 2015, the date Plaintiff filed his original complaint, he claimed that "knee replacement" surgery was being recommended. Dkt. 1 at 3.

United States District Court
Northern District of California

However, Plaintiff does not provide any supporting medical records showing such a recommendation by any SQSP medical personnel. *See* Dkt. 1. Instead, according to Defendant Beatty, Plaintiff "fell into [a] category of conservative treatment with the prospect of *future* surgery, if then warranted, during his time at [SQSP]." Beatty Decl. ¶ 42 (emphasis added). Specifically, Defendant Beatty claims that their choice of treatment were "medically acceptable ones," stating as follows:

> I observe that the outcome from surgery is often unpredictable, and might in various instances worsen someone's physical condition. As a result, it is preferable to exhaust conservative approaches to treatment, which includes pain management as needed, prior to considering surgical intervention.

*Id.* In his opposition, Plaintiff mentions that he has since had surgery at an unknown date, stating: ". . . [Defendants] delayed so long in getting me the surgery I needed that by the time I finally got it the meniscus had completely work out, and it was bone-on-bone." Dkt. 44 at 5. However, even if Plaintiff claims he should have received different treatment for his medical needs—i.e., surgery on his left knee—a difference of opinion as to the urgency and treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058, 1059-60; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837). The evidence here establishes that Defendants Beatty, Devers, and Honey chose a course of treatments that was medically accepted. Although the medical treatment Plaintiff received may not have been what he considered proper treatment, he presents no evidence that these aforementioned Defendants were deliberately indifferent to his serious medical needs. Rather, the undisputed factual record shows that they: (1) continuously monitored and treated Plaintiff, specifically for his complaints of left knee/leg pain; (2) modified his prescribed medications and made referrals to consultants when needed; (3) chose medically acceptable courses of treatment while being aware of the risks associated with his health problems (i.e., left knee/leg pain; back pain; and knee injury from the

fall); (4) provided prescription drugs and ordered x-rays and MRIs when needed; (5) referred Plaintiff for a physical therapy evaluation and an orthopedic follow-up appointment; and (6) continued follow up care afterwards to treat his left knee/leg pain until he was transferred to DVI. Thus, Plaintiff has failed to provide evidence regarding an essential element of his Eighth Amendment claim against Defendants Beatty, Devers, and Honey.

Accordingly, Plaintiff's Eighth Amendment claim fails as a matter of law. Therefore, the court GRANTS Defendants' motion for summary judgment as to Plaintiff's claim that Defendants Beatty, Devers, and Honey were deliberately indifferent to his medical needs.

### B. Supervisory Liability Claim Against Defendant Tootell

While Plaintiff alleges that his Eighth Amendment rights were violated when Defendants Beatty, Devers, and Honey were allegedly deliberately indifferent to his serious medical needs, the Court notes that Plaintiff has failed to link Defendant Tootell (SQSP's Chief Medical Officer) to this Eighth Amendment claim. For example, Plaintiff claims that Defendant Tootell was in charge of the medical staff at SQSP, gave orders to staff to not give anyone more than one-day lay-ins, and denied Plaintiff's requests to meet with her at all levels. Dkt. 1 at 3. Thus, without more, it seems that such allegations do not establish the requisite level of personal involvement.

The Court construes Plaintiff's claim against Defendant Tootell as a supervisory liability claim. However, Plaintiff only makes conclusory allegations that Defendant Tootell gave orders to staff to not give anyone more than one-day lay-ins, and that he denied Plaintiff's requests to meet with her at all levels. *See id.* Conclusions masquerading as facts are insufficient to hold Defendant Tootell accountable. *See Marks v. United States*, 578 F.2d 261, 263 (9th Cir.1978) ("Conclusory allegations unsupported by factual data will not create a triable issue of fact.") (citation omitted). Furthermore, defendants whose personal involvement is not alleged cannot be held liable for the acts of their subordinates under a theory of respondeat superior or vicarious liability. *See Milton v. Nelson*, 527 F.2d 1158, 1159 (9th Cir. 1975). Vicarious liability on the part of a supervisory official is not recognized as a basis for liability under the Civil Rights Act. *Palmer v. Sanderson*, 9 F.3d 1433, 1438 (9th Cir. 1993). A supervisor is liable only when he or she has directly participated in or proximately caused the alleged deprivation. *Id.* at 1437-38; *see*

*also Harris v. City of Roseburg*, 664 F.2d 1121, 1125 (9th Cir. 1981); *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980). The law is clear that liability of supervisory personnel must be based on more than merely the right to control others. *Monell v. Department of Social Services*, 436 U.S. 658, 694 n.58 (1978).

Here, Plaintiff has not made a causal link between Defendant Tootell and a violation of his constitutional rights. To the extent Defendant Tootell is being sued in her capacity as a supervisory official, Plaintiff fails to raise a material issue of fact against this Defendant because nothing in the record shows that she directly participated in or proximately caused the alleged deprivation. In any event, the Court has found above that Plaintiff's Eighth Amendment claim against Defendant Tootell's subordinates—Defendants Beatty, Devers, and Honey—has failed as a matter of law. Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's supervisory liability claim against Defendant Tootell.

## V. CONCLUSION

For the reasons outlined above, the Court rules as follows:

1. Defendants' motion for summary judgment is GRANTED,[16] and judgment will be entered in their favor. Dkt. 37.

2. The Clerk shall terminate all pending motions and close the file.

3. This Order terminates Docket No. 37.

IT IS SO ORDERED.

Dated: August 31, 2018

_____
YVONNE GONZALEZ ROGERS
United States District Judge

---

[16] The Court's finding that Defendants are entitled to summary judgment as to Plaintiff's Eighth Amendment claim obviates the need to address Defendants' alternative argument in their motion, including the failure to exhaust administrative remedies.